## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARILYN AZUZ, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 21-cv-1182 |
| v. | ) ) | Hon. Steven C. Seeger |
| ACCUCOM CORPORATION, d/b/a INFOTRACER, | ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Accucom runs a website where people can search public records for a fee. The website, InfoTracer, allows visitors to get a sneak peek of the available information before they sign up and pay for a subscription. It offers a bit of a teaser, letting visitors see the type of personal information that the website could provide about a particular person.

That sneak peek is the core of the case. Plaintiff Marilyn Azuz filed suit against Accucom, accusing the company of using her personal information to advertise and promote its products without her permission. The theory is that the sneak peek is an advertisement or promotion of the product (meaning the full database), designed to encourage visitors to sign up. In her view, teasing visitors with tidbits of personal information about a specific person violates the Illinois Right of Publicity Act.

Before filing suit, Azuz's counsel conducted an investigation and visited Accucom's website. The attorney wanted to confirm that Azuz's information was, in fact, on the website. So counsel searched the website for information about Azuz, and sure enough, the website offered information about her.

As the company sees it, that search about a potential lawsuit means that Azuz cannot bring a lawsuit at all. The company points out that the website includes terms and conditions, and a visitor agrees to those terms and conditions by using the website. One of those terms and conditions is an arbitration provision.

Accucom now seeks to compel arbitration, based on the use of the website by Plaintiff's counsel. Accucom argues that counsel acted as Azuz's agent when it used the InfoTracer site and performed a search, and thus bound her to the arbitration provision. Alternatively, Accucom contends that Azuz ratified the attorney's action because the complaint includes information from the attorney's visit to the website.

For the reasons that follow, the motion to compel arbitration is denied.

## Background

### I.      InfoTracer's Services

Accucom runs a website, InfoTracer.com, that offers access to a database of over five billion public records. *See* Coler Dec., at ¶ 3 (Dckt. No. 43-2). By searching a person's name, a user can find information about that person, like their current and past addresses, phone numbers, social media accounts, relatives, criminal records, and more. *See* https://InfoTracer.com. Full access to InfoTracer's database requires a fee.

InfoTracer allows visitors to see a free preview of its services, before users sign up and pay the cost of full access to the database. A user simply has to enter certain information – like "name," "phone," and "email" – on the InfoTracer home page, and then hit "Search." The goal is to attract potential users by giving them a sense of what information they might be able to get their hands on.

A forewarning appears right below the big red "Search" button. The website says that "Conducting a search on InfoTracer.com is subject to our Terms of Service and Privacy Notice." *See* Def.'s Renewed Mtn. to Dismiss, at 2 (Dckt. No. 43). The font is small, and the forewarning isn't particularly conspicuous. But it's there. *See* Coler Dec., at ¶ 5 (Dckt. No. 43-2) (showing a screenshot of the website).

The website offers a number of paths for locating the terms and conditions. For example, the search screen includes a hyperlink to the terms and conditions. *Id.* The website includes a hyperlink in other spots, too, including under the Menu bar on the bottom of the home screen. *Id.* at ¶ 6. In fact, a hyperlink to the terms of service appears on the bottom of every page on the website. *Id.* at ¶ 8.

The website says that a visitor accepts the terms and conditions by using the site. A disclaimer appears at the bottom of the home screen: "By using Infotracer you agree to comply with the conditions set forth in the Infotracer terms of service." *Id.* at ¶ 7. The terms of service repeat the point:

> By accessing, browsing, or otherwise using the Sites, you agree to be legally bound by these Terms of Use. PLEASE READ THESE TERMS OF USE CAREFULLY. YOUR USE OF THE SITE CONSTITUTES YOUR ACCEPTANCE OF THESE TERMS OF USE. DO NOT USE THE SITE IF YOU ARE UNWILLING OR UNABLE TO BE BOUND BY THE TERMS OF SERVICE.

*Id.* at ¶ 9.

The terms and conditions include an arbitration provision. A user of the website agrees that "[a]ny dispute concerning [Accucom Corporation], any InfoTracer services, Information, or these Terms will be settled by binding arbitration in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of the American Arbitration Association." *Id.* at ¶ 12. So, anyone who uses the website and views a preview has consented to arbitration.

To conduct a search, a user simply has to enter information into the search engine and then click on the big red "Search" button. At that point, the website displays a "Notice" on the screen (complete with a warning sign: a yellow triangle with an exclamation point in the middle). *Id*. at ¶ 10.

The Notice includes five paragraphs of text. *Id.* The paragraphs describe what InfoTracer.com is, where it gets its material, and how a user can and cannot use the information. *Id.* For example, the Notice says that information about license plates is available only for a purpose that is consistent with a federal statute. *Id.* It has a disclaimer about the Federal Credit Reporting Act, too.

Two large boxes appear at the bottom of that Notice. One says "I DON'T AGREE," and the other one (in an inviting shade of green) says "I AGREE." *Id.* Clicking "I AGREE" is an essential step. A user cannot access the free preview without clicking "I AGREE." *Id.* at ¶ 11.

Clicking on "I AGREE" doesn't mean what you think it might mean. Surprisingly, based on the Court's review, the Notice does *not* appear to refer to the terms of service. The Notice does not say, for example, that clicking on "I AGREE" equals acceptance of the terms and conditions.

Instead, the Notice offers the following explanation of what it means to click "I AGREE." "You understand that by clicking 'I agree,' Infotracer.com will conduct only a preliminary people search of the information you provide and that a search of any records will only be conducted and made available to you after you register for an account or purchase a report." *Id.*[1]

---

[1] As an aside, since the filing of this lawsuit, Accucom has changed the notice on the website. It now says that a user accepts the terms of service by clicking "I AGREE."

So, the Notice itself may not ask users to confirm that they accept the terms and conditions. At least not directly. But elsewhere, the website *does* say – several times – that use of InfoTracer equals acceptance of the terms and conditions. And the terms and conditions include an arbitration provision.

## II.     Claims Against Accucom

The story begins with a Facebook ad for the legal services of Bursor & Fisher in early 2021. *See* Azuz Dep., at 7:18-24 (Dckt. No. 43-1). The ad invited internet users to inquire and see if their name and personal information appeared on a different website (spokeo.com) without their consent. *Id.* at 9:25 – 10:8.

Azuz responded to the ad by submitting her name to the law firm. She was "just curious to see if she was in there." *Id.* at 14:17-23.

Azuz ultimately retained the firm. On February 24, 2021, Bursor & Fisher and Azuz executed an agreement for representation in a class action lawsuit. *See* Representation Letter (Dckt. No. 43-4).

By then, InfoTracer.com had caught Bursor & Fisher's attention and became the new target for a potential lawsuit. At that point, an attorney at Bursor & Fisher, Julian Diamond, rolled up his sleeves and starting investigating the website.

The attorney ran a search on InfoTracer for information about Azuz. He used the information that she had submitted in response to the ad, and he looked to see if the website offered personal information about her. The attorney hit paydirt. He learned that InfoTracer offered a preview of Azuz's personal information, including her name, age, city of domicile, and the identity of her relatives. *See* Cplt., at ¶ 23 (Dckt. No. 1). Counsel took a screenshot, and eventually incorporated that screenshot in the complaint. *Id.* at ¶ 5.

Unlike her lawyer, Azuz has never personally accessed the Infotracer website. *See* Azuz Dep., at 31:1-10 (Dckt. No. 43-1). She hasn't performed a search, and hasn't tried to look up her information. Only her lawyer did.

Azuz ultimately filed a one-count complaint. She alleges that Accucom violated the Illinois Right of Publicity Act, 765 ILCS 1075/1, by using her personal information "for the purpose of advertising or promoting its products without written consent." *See* Cplt., at ¶ 39 (Dckt. No. 1). She seeks compensatory, statutory, and punitive damages on behalf of herself and a putative class. *Id.* at ¶ 41.

Accucom, in turn, moved to dismiss for improper venue. *See* Def.'s Mtn. to Dismiss (Dckt. No. 15). The company argued that Azuz had agreed to arbitrate any claims about the website by using the website. In its view, the existence of an agreement to arbitrate means that the Northern District of Illinois is an improper venue under Rule 12(b)(3). The company also moved to dismiss for lack of personal jurisdiction, and for failure to state a claim.

Azuz responded to the motion by pointing out that she never personally visited the InfoTracer website. *See* Pl.'s Resp. to Def.'s Mtn. to Dismiss, at 8–11 (Dckt. No. 23). In her view, she never agreed to arbitration because she never used the website. Her lawyer visited the website, not her.

That revelation was news to the company. Accucom replied that Azuz's response brief was "purposefully vague" about who visited the site. *See* Def.'s Reply, at 1 (Dckt. No. 24). Accucom questioned who visited the website, and if it was a lawyer, whether the lawyer did so at the direction of Azuz. Defense counsel suggested that the parties take discovery on the existence of an agreement to arbitrate. *Id.* at 8.

This Court agreed and allowed the parties to take limited discovery about whether Azuz had agreed to arbitration. *See* 2/15/22 Order, at 3–4 (Dckt. No. 32). Defense counsel later deposed Azuz.

After discovery, Accucom renewed its motion to dismiss based on improper venue. *See* Def.'s Renewed Mtn. to Dismiss (Dckt. No. 47). That motion is now before the Court.

### Legal Standard

The Federal Arbitration Act "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *See Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). The statutory text expressly requires courts to enforce valid arbitration agreements. "A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2.

Long gone are the days of affording second-class status to agreements to arbitrate. Given the "liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract," courts place arbitration agreements on "equal footing with other contracts, and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (cleaned up).

"Under the FAA, arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Fam. Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017). The party seeking to compel arbitration has the burden of establishing an agreement to arbitrate. *See A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018).

State law governs the issue of contract formation. *See Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 742 (7th Cir. 2010). Ordinary principles of contract formation under state law govern whether parties agreed to arbitration. *See Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012). Arbitration agreements are on equal footing with other contracts, so normal rules about contract formation apply.

Choice of law is not much of a hurdle here. The terms and conditions adopt Massachusetts law. *See* Coler Dec., Ex. 1 (Dckt. No. 43-2). But then again, those terms and conditions apply only if the parties agreed to them, so it begs the question of what law to apply when deciding the issue of contract formation. This Court sits in diversity, so Illinois choice-of-laws rules would determine what law applies.

In any event, the parties agree that there is no substantive difference between the applicable law in Illinois and Massachusetts, so the Court need not perform a conflict of law analysis. *See Gorny v. Wayfair Inc.*, 2019 WL 2409595, at *5 (N.D. Ill. 2019). Like the parties themselves, the Court applies Illinois law.

Accucom frames its challenge as a motion about improper venue under Rule 12(b)(3). That's the wrong procedural hook. In *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas*, 571 U.S. 49, 55 (2013), the Supreme Court held that contractual forum selection clauses do not render a venue "wrong" or "improper" for purposes of Rule 12(b)(3). "Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing about a forum-selection clause." *Id.*

The Seventh Circuit has recognized that a motion to compel arbitration falls under the doctrine of *forum non conveniens*, not improper venue. *See, e.g., Dr. Robert L. Meinders, D.C.,*

*Ltd. v. United Healthcare Servs., Inc.*, 7 F.4th 555, 560 (7th Cir. 2021); *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 701 (7th Cir. 2022); *Kukuvec v. Estée Lauder Cos.*, 2022 WL 16744196, at *1 (N.D. Ill. 2022); *Lukis v. Whitepages Inc.*, 549 F. Supp. 3d 798, 806–07 (N.D. Ill. 2021).  So this Court treats Accucom's motion as a motion to compel arbitration and issue a stay in the meantime.  *See Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 890 (7th Cir. 2020) ("[I]t is the substance of a motion that counts, not its label.").

## Analysis

## I.     Who Decides the Existence of an Agreement to Arbitrate

As a preliminary matter, Accucom argues that an arbitrator, not this Court, must decide whether the parties agreed to arbitration.  *See* Def.'s Renewed Mtn. to Dismiss, at 8 (Dckt. No. 43).  So the first question is a familiar one:  who decides?

The terms and conditions on InfoTracer's website provide that the parties must arbitrate any dispute in Boston "in accordance with the Commercial Arbitration Rules of the American Arbitration Association."  *See* Coler Dec., at ¶ 12 (Dckt. No. 43-2).  According to Accucom, one such Rule is that an arbitrator "'shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.'"  *See* Def.'s Renewed Mtn. to Dismiss, at 8 (Dckt. No. 43) (quoting American Arbitration Association Rule 7(a)).  In Accucom's view, an arbitrator – not this Court – must decide whether there is an enforceable arbitration agreement.

Not so.  The existence of an agreement to arbitrate is a question for courts.  *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416–17 (2019); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70–

71 (2010); *CCC Intelligent Sols. Inc. v. Tractable Inc.*, 36 F.4th 721, 723 (7th Cir. 2022). "To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).

The existence of a valid arbitration agreement is a "gateway" issue that the court must decide (unless the parties have agreed to arbitrate that gateway issue). *See Herrington v. Waterstone Mortg. Corp.*, 907 F.3d 502, 506 (7th Cir. 2018); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) ("It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide."); *Janiga*, 615 F.3d at 742 ("[T]he court must decide whether a contract exists before it decides whether to stay an action and order arbitration."). The Seventh Circuit has made clear that "[e]ven the most sweeping delegation cannot send the contract-formation issue to the arbitrator, because, until the court rules that a contract exists, there is simply no agreement to arbitrate." *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022).

True, parties can agree to arbitrate questions of arbitrability, including whether the parties agreed to arbitrate a particular dispute in the first place. *See Henry Schein*, 139 S. Ct. at 529. But an agreement to arbitrate – including an agreement to arbitrate the existence or scope of an agreement to arbitrate – must come first. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1995) ("Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter.") (emphasis in original).

The arbitrator can't decide *anything* unless the parties have agreed to arbitrate *something*. There is no chicken-and-the-egg problem when it comes to arbitration: an agreement to arbitrate must come before the question of arbitrability.

The existence of an agreement to arbitrate must come first. It is an antecedent question. *See Rent-A-Center, West*, 561 U.S. at 70–71 ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."). And the answer to that antecedent question must come from a court.

Arbitrators can't decide anything without an agreement to arbitrate, so courts must decide whether the parties agreed to arbitration. The arbitration is the cart, and the agreement to arbitrate is the horse.

## II.     Existence of an Arbitration Agreement

This Court, not an arbitrator, must decide whether there is an enforceable agreement to arbitrate. As the party seeking to enforce the alleged arbitration agreement, Accucom has the burden of establishing that an agreement exists. *See A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018).

Before diving in, it is important to highlight a potential issue that is not at issue here. Contract formation requires mutual assent, viewed through an objective lens. *See Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). And when contract formation takes place over web pages, a potential issue is "whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms." *Id.*

11

Parties sometimes litigate whether the website provided adequate notice to the user that use of the site will constitute acceptance of the terms. *See, e.g.*, *Fischer v. Instant Checkmate LLC*, 2021 WL 3033586, at *4–6 (N.D. Ill. 2021); *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 880–87 (N.D. Ill. 2020); *Gorny v. Wayfair Inc.*, 2019 WL 2409595, at *6 (N.D. Ill. 2019). But here, Azuz does not dispute that the website gave users adequate notice that use of the website constituted acceptance of the terms and conditions. Any such argument is waived.

Another potential issue is off the table, too. Discovery confirmed that Azuz did not personally visit the InfoTracer website. The parties also agree that she never accepted the site's terms for herself. And they agree that her attorney (Diamond) visited the website and performed the search. So, no one is arguing that Azuz personally consented to arbitration.

Accucom seeks to compel arbitration on two grounds. First, Accucom argues that the lawyer had actual or apparent authority to agree to the arbitration provision on Azuz's behalf. Second, Accucom argues that Azuz ratified her attorney's agreement by using the information in the complaint. In sum, the first issue involves agency, and the second issue involves ratification.

## A. Authority to Act as an Agent

The first question is whether Azuz's counsel had actual or apparent authority to accept the terms and conditions and agree to the arbitration provision on Azuz's behalf. If so, then the case must go to arbitration. If not, then the case can stay here.

As a general matter, a person is not bound by a contract that he or she did not agree to. *See Long v. Loft Rehab. & Nursing of Canton, LLC*, 2022 WL 18011945, at *6 (Ill. App. Ct. 2022). And in particular, "arbitration is contractual. A party 'cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Scheurer*, 863 F.3d at 752 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582

(1960)); *see also A.D.*, 885 F.3d at 1059 ("[A]n arbitration agreement generally cannot bind a non-signatory."); *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005).

But there are exceptions. *See A.D.*, 885 F.3d at 1059–61; *see also Fyrnetics (Hong Kong) Ltd. v. Quantum Grp., Inc.*, 293 F.3d 1023, 1029 (7th Cir. 2002) (noting the doctrines of assumption, agency, equitable estoppel, veil piercing, and incorporation by reference). For present purposes, the most important exception involves agency.

In certain circumstances, an agent can agree to a contract on behalf of the principal, and thus bind the principal to its terms. *See KCK Indus., LLC v. MCM Mgmt. Corp.*, 2020 WL 5209855, at *8 (N.D. Ill. 2020) ("The general rule is that a principal is bound by a contract executed by the principal's agent, so long as the agent acted with actual (or apparent) authority and the parties understood that the agent was acting on behalf of the principal.").

That rule applies to arbitration agreements, too. Agents can bind principals to arbitration agreements. *See Janiga v. Questar Capital Corp.*, 615 F.3d 735, 743 (7th Cir. 2010) ("Certainly an agent may bind a principal to an arbitration agreement."). An arbitration agreement is a contract, and agents can bind principals to arbitration agreements – just like any other contract. Once again, normal rules apply.

But an agent can bind the principal only if the agent has the authority to do so. *See Braundmeier v. Ancestry.com Operations Inc.*, 2022 WL 17176524, at *2 (N.D. Ill. 2022) (citing *Fyrnetics*, 293 F.3d at 1029); *La Fronza v. PEOPLECONNECT, Inc.*, 2022 WL 1292219, at *2 (N.D. Ill. 2022). An agent can act with actual or apparent authority. *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1065 (7th Cir. 2000). The words or conduct of the principal, not the agent, determine the actual or apparent authority of the agent. *Id.*; *see also KCK Indus.*, 2020 WL 5209855, at *8.

13

To sum up, Azuz is not bound by the arbitration provision unless she agreed to it. Azuz (the principal) could agree to the arbitration provision through her agent (Diamond, the attorney). But the attorney could accept the arbitration agreement on her behalf only if the attorney had actual or apparent authority to do so.

### 1.     Actual Authority

The first question is whether the attorney had actual authority to accept the arbitration agreement on Azuz's behalf. The Court concludes that the attorney did not.

Actual authority is what it sounds like – the principal gave the agent actual authority to act on her behalf. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *See* Restatement (Third) of Agency § 2.01 (2006).

Actual authority comes in two flavors: express and implied. *See C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 783 (Ill. 1999); *Siena at Old Orchard Condo. Ass'n v. Siena at Old Orchard, L.L.C.*, 75 N.E.3d 420, 443 (Ill. App. Ct. 2017). "Actual authority is express or implied; express authority is, of course, a specific grant of authorization to perform a particular act, and implied authority is that which is inherent in an agent's position." *Progress Printing Corp. v. Jane Byrne Pol. Comm.*, 601 N.E.2d 1055, 1066 (Ill. App. Ct. 1992).

Express authority exists when the principal gives express permission to the agent to do something. "An agent has express authority when the principal *explicitly* grants the agent the authority to perform a particular act." *C.A.M. Affiliates*, 715 N.E.2d at 783 (emphasis added).

Implied authority, on the other hand, "'is actual authority that is implied by facts and circumstances and it may be proved by circumstantial evidence.'" *Opp*, 231 F.3d at 1064

14

(quoting *Wasleff v. Dever*, 550 N.E.2d 1132, 1138 (Ill. App. Ct. 1990)). Unlike a situation with express authority, a principal who gives her agent implied authority doesn't explicitly tell the agent to do the act in question. Instead, "[a]n agent has implied authority for the performance or transaction of anything reasonably necessary to effective execution of his express authority." *Id.* (quoting *Advance Mortg. Corp. v. Concordia Mut. Life Ass'n*, 481 N.E.2d 1025, 1029 (Ill. App. Ct. 1985)).

This case does not involve express authority. There is nothing in the record suggesting that Azuz ever gave her attorney the express authority to accept the arbitration agreement on her behalf. That authority is not in the retention agreement. *See* Representation Letter (Dckt. No. 43-4). The retention agreement said nothing about arbitration.

The retention agreement did not expressly authorize the attorney to visit the website, or accept any terms and conditions, either. In fact, the retention letter said that the firm "has thoroughly investigated this matter," without suggesting that any visit to the website was forthcoming. *Id.*

Discovery did not uncover any other evidence of express authority. Azuz testified that she did not direct her lawyer to go to the website. *See* Azuz Dep., at 33:10-19 (Dckt. No. 44-1). And she did not know that using the website required the user to accept the terms and conditions. *Id.* at 31:2-10. There is no evidence that she knew about the arbitration provision at all, let alone authorized her attorney to accept it on her behalf.

The next possibility is implied authority. On this record, the attorney did not have the implied authority to agree to the arbitration provision on behalf of Azuz.

Again, implied authority is the agent's power to do "anything reasonably necessary to effective execution of his express authority." *Opp*, 231 F.3d at 1064. Authorization to accept

binding arbitration was not implicit in any power given to the attorney. Giving up the right to bring a lawsuit (in federal court) was not implicit in the authority to pursue a lawsuit.

If anything, the retention agreement dispels any suggestion that the attorney might give away the right to go to court. The retention agreement referred to asking a "court" for relief. *See* Representation Letter (Dckt. No. 43-4) ("We may, however, ask the court to award us attorneys' fees, costs and/or expenses . . . ."). A reader would have no inkling that the attorney might surrender the power to go to the courthouse in the first place.

Azuz retained counsel to pursue a claim on her behalf. The attorney had the implied authority to pursue the client's rights, but not give up the client's rights. The express power to pursue a lawsuit did not come with the implied power to give up the right to bring a lawsuit.

Finding implied authority is especially dicey in the context of legal representation. Under Illinois law, lawyers wear two hats. They are agents, but they are independent contractors, too. Sometimes an attorney acts as an agent, and sometimes an attorney acts as an independent contractor. *See Horwitz v. Holabird & Root*, 816 N.E.2d 272, 277 (Ill. 2004); *Selby v. O'Dea*, 156 N.E.3d 1212, 1217 (Ill. App. Ct. 2020).

Illinois courts have developed this distinction in the context of tort liability. In *Horwitz*, the Illinois Supreme Court addressed when a client is liable for an attorney's torts. It began by recognizing that an attorney is both an agent *and* an independent contractor. *See Horwitz*, 816 N.E.2d at 279.

An attorney is an agent in that they owe a fiduciary duty to their clients and can bind their clients through their actions. *Id.* But an attorney also "usually pursues a client's legal rights without specific direction from the client, using independent professional judgment to determine the manner and form of the work," and so is sometimes an independent contractor. *Id.*

"An independent contractor is defined by the level of control over the manner of work performance." *Id.* Most of the time, clients seek help from a lawyer "because they are unfamiliar with the law and unable to perform the work themselves." *Id.* So, "an attorney usually pursues a client's legal rights without specific direction from the client, using independent professional judgment to determine the manner and form of the work." *Id.*

That room to maneuver – without specific direction from the client – means that the attorney is acting as an independent contractor. At least in the context of tort liability, Illinois law generally holds that when "an attorney acts pursuant to the exercise of independent professional judgment, he or she acts presumptively as an independent contractor whose intentional misconduct may generally not be imputed to the client," unless the client "specifically directed, controlled, or authorized the attorney's precise method of performing the work." *Id.*

And, when the attorney acts as an independent contractor (and not an agent), there is no vicarious liability. *Id.*; *see also Petrovich v. Share Health Plan of Illinois, Inc.*, 719 N.E.2d 756, 765 (Ill. 1999) ("As a general rule, no vicarious liability exists for the actions of independent contractors. Vicarious liability may nevertheless be imposed for the actions of independent contractors where an agency relationship is established . . . .").

Attorneys often receive high-level authorization in a litigation setting, along the lines of "go forth and conquer." That authorization does not mean that the client is on the hook for any plundering and pillaging that might ensue.

Extending that principle from the context of tort liability to the context of contract formation is not much of a leap. Here, the attorney received authorization from Azuz to pursue a lawsuit. But investigating and pursuing that lawsuit was more akin to the act of an independent contractor than the act of an agent. How the lawyer got from Point A to Point B was an act of

17

"independent professional judgment." *Id.* The express power to "go forth and conquer" does not include the implied power to "go forth and surrender."

### 2. Apparent Authority

The next question is whether the attorney had apparent authority to accept the arbitration agreement on Azuz's behalf. Once again, the Court concludes that the attorney did not.

Under the doctrine of apparent authority, "a principal will be bound not only by the authority that it actually gives to another, but also by the authority that it appears to give." *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1065 (7th Cir. 2000) (quoting *Petrovich v. Share Health Plan of Illinois, Inc.*, 719 N.E.2d 756, 765 (Ill. 1999)). "Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf." *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 577 N.E.2d 1344, 1350 (Ill. App. Ct. 1991).

Apparent authority protects third parties who rely on a principal's representations that an agent possesses the authority to act. "A principal that places an agent in a situation where the agent may be presumed to have authority to act is estopped as against a third party from denying the agent's apparent authority." *Loncarevic & Assocs., Inc. v. Stanley Foam Corp.*, 72 N.E.3d 798, 807–08 (Ill. App. Ct. 2017) (internal quotation marks omitted). The doctrine prevents a principal from faking out a third party, by creating the impression that an agent has authority, and then pulling the rug out when the third party wants to hold the principal to it.

The impression of authority must come from the principal herself, not the agent. *See Weil, Freiburg & Thomas*, 577 N.E.2d at 1350. Apparent authority exists when "a *principal* creates" the impression that the agent has authority. *Id.* (emphasis added). "Only the words and conduct of the alleged principal, not the alleged agent, establish the authority of an agent."

*C.A.M. Affiliates, Inc. v. First American Title Ins. Co.*, 715 N.E.2d 778, 783 (Ill. 1999); *see also* Restatement (Third) of Agency § 2.03 cmt. c (2006) ("A belief that results solely from the statements or other conduct of the agent, unsupported by any manifestations traceable to the principal, does not create apparent authority unless, as explained below, the agent's conduct has been directed by the principal.").

Here, Azuz herself did not do anything to create the impression that the lawyer had authority to act on her behalf. She didn't send any signals to Accucom that the lawyer had her proxy to enter into a contract. In fact, Azuz didn't communicate with Accucom at all, let alone create the impression that the attorney was acting on her behalf.

The lack of communications between Azuz and Accucom dooms any argument about apparent authority. The simple reality is that nothing was apparent to Accucom because Azuz never said or did anything. *See Baumeister v. Deutsche Lufthansa, AG*, 811 F.3d 963, 969 (7th Cir. 2016) (finding no apparent authority because "Iberia did nothing to create an impression that American was authorized to create a contract between Iberia and the Varsamises"); *CHS Acquisition Corp. v. Watson Coatings, Inc.*, 2018 WL 3970137, at *11 (N.D. Ill. 2018) ("Watson has not alleged any facts to support the notion that *BASF*, the alleged principal, as opposed to *IMCD*, the alleged agent, said or did anything to create this impression of apparent authority.") (emphasis in original); *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 778 (N.D. Ill. 2014) ("Plaintiffs' apparent authority theory against Farmers, moreover, fails for the additional reason that Plaintiffs do not trace any belief they may have about an agency relationship between Farmers and Variable to a manifestation of Farmers (the principal), rather than a representation made by Variable (the agent).").

It would not matter even if the attorney had added a note on the website, saying "I'm acting on behalf of a client." An agent cannot create apparent authority. The aura of authority must come from the principal, not the agent. *See* Restatement (Third) of Agency § 2.03 cmt. c (2006) ("An agent's success in misleading the third party as to the existence of actual authority does not itself make the principal accountable."). Authority – actual, or apparent – must come from the principal herself, or not at all.

In sum, the Court concludes that the attorney did not have actual or apparent authority to act on behalf of Azuz when the attorney used the website and agreed to the arbitration provision.

### B.    Ratification

Next, Accucom argues that Azuz is bound by the arbitration agreement under the doctrine of ratification. Once again, the Court disagrees.

A principal "can ratify a contract when the principal enjoys the benefits of the contract and does not repudiate it." *See NECA-IBEW Rockford Loc. Union 364 Health & Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1059 (7th Cir. 2013). "Ratification is the equivalent of authorization, but it occurs after the fact, when a principal gains knowledge of an unauthorized transaction but then retains the benefits or otherwise takes a position inconsistent with nonaffirmation." *Progress Printing Corp. v. Jane Byrne Pol. Comm.*, 601 N.E.2d 1055, 1067 (Ill. App. Ct. 1992); *see also* Restatement (Second) of Agency § 82 (2006) ("Ratification is the affirmance . . . of a prior act.").

"For ratification to occur, the principal must, with full knowledge of the act, manifest an intent to abide and be bound by the transaction. Ratification may be inferred from surrounding circumstances, including long-term acquiescence, *after notice*, to the benefits of an allegedly unauthorized transaction." *Cove Mgmt. v. AFLAC, Inc.*, 986 N.E.2d 1206, 1215 (Ill. App. Ct.

2013) (emphasis in original) (cleaned up); *see also* Restatement (Third) of Agency § 4.02 cmt. d (2006) ("Ratification requires an objectively or externally observable indication that a person consents that another's prior act shall affect the person's legal relations.").

Accucom believes that Azuz ratified the contract by including the screenshots of the website in the complaint. *See* Cplt., at ¶ 5 (Dckt. No. 1). But ratification requires "that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction." *See Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004). And here, nothing in the record suggests that Azuz knew that she was accepting the terms and conditions – and agreeing to arbitration – when her attorney cited the website.

Another court in this district recently rejected a ratification argument when a lawyer clicked on a website while doing research. *See Braundmeier v. Ancestry.com*, 2022 WL 17176524 (N.D. Ill. 2022). In that case, the court found "no evidence that the plaintiffs discovered this arbitration agreement (or the later research by [counsel]), received any benefits, had knowledge of the facts until this motion, and elected in some way to accept the agreement." *Id.* at *3.

So too here. The Court fails to see any meaningful benefit Azuz received from Diamond's use of InfoTracer. And "[i]f there is no benefit, ratification will not be implied." *Horwitz*, 816 N.E.2d at 280.

Accucom thinks that Azuz received a benefit by citing the screenshots in the complaint. *See* Def.'s Reply to Mtn. to Dismiss, at 10 (Dckt. No. 54). That's not much of a benefit because those screenshots were not essential to the claim. *See Smart Data, Inc. v. United Parcel Serv., Inc.*, 552 N.E.2d 1089, 1093 (Ill. App. Ct. 1990) ("We do not agree that plaintiff's legal right to

sue . . . constituted a sufficient benefit to plaintiff that plaintiff should be considered to have ratified defendant's actions.").

Under Illinois law, courts typically find ratification only when the principal receives a far more tangible benefit from the agent's actions. *See, e.g.*, *Williams v. East-West Univ.*, 2021 WL 4477826, at *6 (N.D. Ill. 2021) (principal kept money from unauthorized agreement); *Condon & Cook, LLC v. Mavrakis*, 69 N.E.3d 274, 286 (Ill. App. Ct. 2016) (unauthorized settlement agreement allowed principal to refinance with bank); *Progress Printing*, 601 N.E.2d at 1068 (principal used campaign materials secured through unauthorized order); *Effingham State Bank v. Blades*, 487 N.E.2d 431, 434 (Ill. App. Ct. 1985) (principal used new horse racetrack after unauthorized improvements).

Think about it this way. Accucom dislikes the fact that the screenshots appear in the complaint. If that's a problem, there is an easy solution. Theoretically speaking, Azuz could file an amended complaint and take them out. And then, things could getting rolling here in federal court. If that step seems unnecessary and insubstantial, that reaction says a lot about whether Azuz received a benefit. Truth be told, there's not much there.

### Conclusion

For the reasons above, the motion to compel arbitration is denied.

Date:  March 15, 2023

Steven C. Seeger
United States District Judge