**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MARILYN AZUZ, individually and on behalf of all others similarly situated, | Case No. 1:21-cv-01182 |
| Plaintiff, | Honorable Judge LaShonda A. Hunt |
| v. | Magistrate Judge Jeannice W. Appenteng |
| ACCUCOM CORPORATION, | |
| Defendant. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

I.   Introduction ...................................................................................................1

II.   Factual Background ........................................................................................3

III.  Argument ......................................................................................................4

    1.   Plaintiff's claims satisfy Article III's standing requirements. ......................................4

        A.   Defendant's holding out of Plaintiff's identity to promote its subscription products is an injury in fact ....................................................................5

        B.   Defendant's programmatic use of Plaintiff's identity to advertise its products satisfied Article III's causation requirement. ...................................................11

        C.   Defendant's remedial steps to "opt-out" Azuz from search results do not deprive her of standing to pursue injunctive relief. ...........................................13

    2.   Defendant's derivative arguments seeking denial of a separate motion brought by proposed intervenors should be rejected ...................................................16

IV.  Conclusion ....................................................................................................18

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Adarand Constructors, Inc. v. Slater*,
    528 U.S. 216 (2000) ............................................................................................14

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ..............................................................................................14

*Deakins v. Monaghan*,
    484 U.S. 193 (1988) .......................................................................................15, 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*,
    528 U.S. 167 (2000) ............................................................................................14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................4, 5, 11

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) .......................................................................................5, 11

*United States v. Concentrated Phosphate Export Assn, Inc.*,
    393 U.S. 199 (1968) ............................................................................................16

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................................4, 5

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ..............................................................................................4

**United States Circuit Court of Appeals Cases**

*In re Allstate Corp. Sec. Litig.*,
    966 F.3d 595 (7th Cir. 2020) .............................................................................17

*Patel v. Facebook, Inc.*,
    932 F.3d 1264 (9th Cir. 2019) ...........................................................................16

*Phillips v. Ford Motor Co.*,
    435 F.3d 785 (7th Cir. 2006) .............................................................................17

*Sterk v. Redbox Automated Retail, LLC*,
    770 F.3d 618 (7th Cir. 2014) .............................................................................11

*Walters v. Edgar*,
    163 F.3d 430 (7th Cir. 1998) ........................................................................17

**United States District Court Cases**

*Bonilla v. Ancestry.com Operations Inc.*,
    574 F. Supp. 3d 582 (N.D. Ill. 2021) ...............................................................5

*Fischer v. Instant Checkmate LLC*,
    2022 WL 971479 (N.D. Ill. Mar. 31, 2022)............................................. *passim*

*Fry v. Ancestry.com Operations Inc.*,
    3:22-CV-140 JD, 2023 WL 2631387 (N.D. Ind. Mar. 24, 2023) ..............................12, 13

*Hoffower v. Seamless Contacts Inc.*,
    22 C 2079, 2024 WL 2882213 (N.D. Ill. June 7, 2024) ........................... *passim*

*Hudgins v. Bd. Of Educ. of City of Chicago*,
    No. 23 C 218, 2023 WL 4303004 (N.D. Ill. June 30, 2023) ............................17

*Kellman v. Spokeo, Inc.*,
    21-CV-08976-WHO, 2024 WL 2788418 (N.D. Cal. May 29, 2024)...........................7, 13

*Lukis v. Whitepages Inc.*,
    549 F. Supp. 3d 798 (N.D. Ill. 2021) ...........................................................4, 5, 7

*Nolen v. PeopleConnect, Inc.*,
    20-CV-09203-EMC, 2023 WL 4303645 (N.D. Cal. June 30, 2023)....................... *passim*

*Stampley v. Altom Transp., Inc.*,
    14 CV 3747, 2019 WL 10891858 (N.D. Ill. Feb. 4, 2019)................................17

*Verde v. Confi-Chek, Inc.*,
    No. 21 C 50092, 2021 WL 4264674 (N.D. Ill. Sept. 20, 2021).........................7

*Wilson v. Ancestry.com LLC*,
    653 F. Supp. 3d 441 (S.D. Ohio 2023) ...................................................11, 12

**Illinois Supreme Court Cases**

*In re Saladino*,
    71 Ill. 2d 263 (1978) ........................................................................12

*In re Howard*,
    69 Ill. 2d 343 (1977) ........................................................................12

**Illinois Appellate Court Cases**

*Trannel v. Prairie Ridge Media, Inc.*,
   987 N.E.2d 923 (Ill. App. Ct. 2013) ..................................................................6

**Statutes**

765 ILCS 1075/5 ............................................................................................................6

765 ILCS 1075/10 ................................................................................................6, 7, 9, 12

765 ILCS 1075/30 ..........................................................................................................6

**Constitutional Provisions**

U.S. Const. art. III, § 2 .......................................................................... *passim*

## I.      Introduction

After litigating for more than three years, including conducting jurisdictional discovery, losing a motion to compel arbitration, conducting merits discovery, and on the verge of class certification briefing, Defendant now claims that Plaintiff never had standing to bring this lawsuit in the first place. Relying on information that it alone has had since the outset of the case, Defendant only now tries to use it as a trump card in an effort to end this long-running suit not only for Plaintiff's case, but for the entire putative class that she represents. While Defendant's standing argument is hardly clear, it's main thrust is that Plaintiff does not have standing because her attorneys—among others—searched for her name on Defendant's "people-search" website. Defendant further claims that because it unilaterally suppressed Plaintiff's identity from further searches, Plaintiff cannot pursue her injunctive claims. Defendant is wrong on all fronts.

Just like its litigation choices, only Defendant is responsible for the underlying conduct that gives rise to the right-of-publicity violation in this case: it decided to design and deploy a website that sells background reports on thousands of individuals—including Plaintiff, the putative class, and the proposed intervenors—to anyone who cared to search the website, without the consent of the individuals whose identity it was using to sell its product. "Holding out" these individuals' identities for a commercial purpose, as Defendant demonstrably did here, is all that is necessary for Article III standing to accrue; there is no "viewing" requirement, as Defendant suggests. *Hoffower v. Seamless Contacts Inc.*, 22 C 2079, 2024 WL 2882213, at *3 (N.D. Ill. June 7, 2024) (Kennelly, J.); *Fischer v. Instant Checkmate LLC*, 2022 WL 971479, at *10 (N.D. Ill. Mar. 31, 2022). Even if there were a viewing requirement, that is met here, too. Defendant held out Plaintiff's identity just as eagerly to Plaintiff's own counsel as it did to Defendant's counsel and other attorneys with no involvement in the litigation—in every case, Defendant was

trying to sell a background-check product using Plaintiff's identity, and in fact, was holding that identity out to people quite likely to buy it. Given that the entire purpose of Defendant's website is to advertise and sell reports on individuals like Plaintiff, it cannot plausibly claim surprise that someone like Plaintiff's attorneys, or the many other attorneys involved in the case, who use background-check services just like the one Defendant is trying to sell, used Defendant's website to do so here. As other courts have already held, this is enough for Article III standing. *See Hoffower*, 2024 WL 2882213, at *3 (finding standing in Illinois Right of Publicity Act ("IRPA") case when only search of plaintiff's name was conducted by attorneys). Defendant can make merits arguments about whether these searches ultimately entitle Plaintiff to relief, but that is a separate question not before the Court. At this juncture, Plaintiff and the class have standing.

Ultimately, Defendant's motion is heavy on invective and light on substantive points. Defendant tries hard to paint Plaintiff's retention of counsel or the investigation of her claims as somehow improper, (*see* Mem. at 2 (vaguely referencing a "questionable" advertisement, repeatedly referring to "solicitation")), but notably never actually advances a single argument on this point. This performative outrage continues Defendant's theme of calling into question counsel's behavior with undeveloped accusations of misconduct that, again, never result in an actual argument. (*See* dkt. 110 (suggesting that proposed plaintiffs were improperly solicited).) That's because every aspect of counsel's actions has been entirely proper. Plaintiff's retention was unremarkable, as was her counsel's diligent investigation of her claims. Defendant's hand-waving toward impropriety is not a substitute for a cohesive argument or relevant caselaw.

As it stands, Defendant thinks it has figured out a way to end the claims not only of Plaintiff but a putative class of thousands, based on information that it sat on for three years. The law does not support that effort. Defendant's standing arguments should be rejected.

## II.     Factual Background

Defendant's people-search website monetizes individuals' identities through the sale of "background reports" to the public. (Compl. ¶ 1.) Anyone who visits the website can use the search bar on the homepage to enter the first and last name of a particular individual. (*Id.* ¶ 3.) Defendant then compiles a list of search results that corresponds to an actual person that Defendant has located and matches the searched-for name. (*Id.* ¶ 4.) These search results provide a limited, free preview of Defendant's reports that includes the searched-for individual's name (including middle initials), age, current city and state of residence, the searched individual's relatives, and other identifying information. (*Id.* ¶ 5; Dkt. 136 ¶ 4.) This teaser profile appears next to a prominent red button that offers searchers complete reports, if only they sign up for Defendant's subscription services that allow access to an unlimited number of its reports per month. (Compl. ¶ 5; Dkt. 136 ¶ 4.) In this way, the advertisements hold out the names and other personal details of Plaintiff and putative class members to drive Defendant's subscription business. (Compl. ¶¶ 5-6, 23-25.) Defendant did not get consent to do so. (*Id.* ¶¶ 26–27, 39.)

Defendant moved to dismiss and to compel arbitration. After taking jurisdictional discovery, the Court denied defendant's motion. (Dkt. 59.) The parties thereafter continued to litigate the case and participate in discovery for the next year. Notwithstanding that Defendant was in possession of its search results records since the case's inception, Defendant waited until May 23, 2024, to produce the bulk of the material it relies on in its motion, and July 1, 2024, to actually file its motion to dismiss for lack of subject matter jurisdiction. (*See* dkt. 134.) Defendant conspicuously leaves out that the Rule 408 letter it references (Mem. at 3) was not sent until February 29, 2024, and expressly omitted any of the searches conducted by individuals besides Plaintiff's counsel. It also included *none* of the records that Defendant attaches to the

Coler Declaration. (Dkt. 136-6 at 9–74.) Those records set out that two other individuals besides Plaintiff's attorneys searched for her name and were presented with those same search results, including two searches by an individual not affiliated with the case, and an employee of Defendant's who also searched for Plaintiff twice using his personal email address. (Mem. at 6; Dkt. 136-6 at 9–74, 76, 78.) Defendant also claims for the first time in its motion that, following the well-trod path of defendants unsuccessfully attempting to moot claims by implementing their own remedies, in this case "opting out" Plaintiff from future search results. (Mem. at 7.)

**III. Argument**

**1. Plaintiff's claims satisfy Article III's standing requirements.**

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const., art. III, § 2). "[T]he 'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). While its arguments blend together, Defendant takes issue with the first two elements, contesting that Plaintiff has not suffered an injury in fact, and that the injury is not fairly traceable to Defendant's conduct. Defendant also claims that its unilateral decision to opt-out Plaintiff from future searches deprives Plaintiff from seeking injunctive relief. Not so. As courts have held time and again in cases dealing with the same claims and same types of websites, IRPA claims like Plaintiff's meet each of Article III's requirements. *See Lukis v. Whitepages Inc.*, 549 F. Supp. 3d 798, 805 (N.D. Ill. 2021) (holding that "[v]iolations of the IRPA are an easy case under the governing test" to determine standing).

4

### A. Defendant's holding out of Plaintiff's identity to promote its subscription products is an injury in fact.

Defendant claims that Plaintiff cannot meet Article III's injury-in-fact requirement because Plaintiff's attorneys searched for Plaintiff on Defendant's website. That's not the case. Defendant's entire business is built on selling subscriptions by holding out the personal information of individuals who never consented to having their identities used. That's why courts consistently hold that there is no "viewing" requirement for an IRPA violation, including for standing to exist. *See Hoffower*, 2024 WL 2882213, at *3; *Fischer*, 2022 WL 971479, at *13. Even if there were a viewing requirement, Defendant held out teaser advertisements to people likely to buy Defendant's products: attorneys like Plaintiff's. Defendant pitched its products to others, including an attorney from a defense firm working to get business, and to an employee at Defendant's company. Under any metric, Plaintiff has shown an injury in fact.

The injury-in-fact requirement asks whether a plaintiff "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). "The Supreme Court explained that 'concrete injury' requires that Plaintiff sustain harm that 'has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms.'" *Bonilla v. Ancestry.com Operations Inc*., 574 F. Supp. 3d 582, 591 (N.D. Ill. 2021) (quoting *Spokeo*, 578 U.S. at 330, 340–41). As relates to the IRPA, "multiple judges of this court have concluded that 'an IRPA violation inflicts a concrete injury-in-fact under Article III.'" *Hoffower*, 2024 WL 2882213, at *3 (collecting authority and tracing history of common law to IRPA); *Lukis*, 549 F. Supp. 3d at 805 ("[U]nder the analysis articulated in *Spokeo* and recently reiterated in *TransUnion*, that an IRPA violation inflicts a concrete injury-in-fact under Article III.").

In reaching this conclusion, courts recognize that the injury-in-fact requirement (and a violation of IRPA) is met even without a third-party viewing. *See Hoffower*, 2024 WL 2882213, at *3–*4; *Fischer*, 2022 WL 971479, at *13. The IRPA recognizes and enshrines "the right to control and to choose whether and how to use an individual's identity for commercial purposes." 765 ILCS 1075/10. It thus prohibits the "use [of] an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent" 765 ILCS 1075/30(a). "Commercial purpose" means "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; [or] (ii) for purposes of advertising or promoting products, merchandise, goods, or services . . . ." 765 ILCS 1075/5. Illinois courts have recognized a distinction between "public use" and "holding out:" "'[h]olding out' is not defined, but it must mean something other than 'public use.'" *Trannel v. Prairie Ridge Media*, *Inc.*, 987 N.E.2d 923, 930 (Ill. App. 2d 2013). As to holding out, the IRPA "prohibits the holding out—meaning the representation—of an individual's identity on or in connection with certain activities." *Id.* The IRPA's restrictions on the use of a person's identity don't turn on the intent of the person searching for or viewing a person's identity; rather, they turn on how a would-be defendant uses the identity. *See* 765 ILCS 1075/30(a). In the case of an entity that holds out that person's identity in connection with advertising its own product, as is the case here, that use subjects the entity to IRPA liability. *Id.*

Courts "have addressed the third-party viewership issue and unequivocally held that third-party viewership is not an element of a right of publicity claim." *Nolen v. PeopleConnect, Inc.*, 20-CV-09203-EMC, 2023 WL 4303645, at *5 (N.D. Cal. June 30, 2023) (surveying IRPA and similar right of publicity statutes codified in California and Ohio law and finding no viewership requirement); *see Hoffower*, 2024 WL 2882213, at *3 (rejecting argument that third-

party viewing was required to sustain IRPA claim, finding injury in fact existed); *Kellman v. Spokeo, Inc.*, 21-CV-08976-WHO, 2024 WL 2788418, at *5 (N.D. Cal. May 29, 2024) ("I previously addressed and rejected [defendant's] arguments that the plaintiffs whose teaser profiles were not viewed do not have standing."); *Fischer*, 2022 WL 971479, at *13 ("Plaintiffs' claims do not require any third-party display."); *Lukis*, 549 F. Supp. 3d at 805 (finding Article III standing without any discussion of third-party viewing). The injury doesn't stem from a third-party viewing the defendant's representation of an individual's identity, but rather the control over an individual's identity that a defendant takes from that individual. *See* 765 ILCS 1075/10. Thus, the injury-in-fact requirement is met even if the *only* search of a plaintiff's identity was conducted by plaintiff's attorney, which is not the case here, as discussed below. *Hoffower*, 2024 WL 2882213, at *3–*4; *see also Nolen*, 2023 WL 4303645, at *8.

Defendant does not meaningfully grapple with *any* of this authority, nor does it attempt to explain how these courts, according to Defendant, got it wrong. Instead, Defendant cites *Verde v. Confi-Chek, Inc.*, No. 21 C 50092, 2021 WL 4264674, at *5 (N.D. Ill. Sept. 20, 2021), in support of its claim that IRPA requires third-party viewing for Article III standing to exist. *Verde*, however, is an outlier. As Judge Kennelly recognized, "since *Verde*, courts in other districts have overwhelmingly concluded that alleging third party viewership of the plaintiff's information is not required to establish standing to bring right of publicity claims arising from statutes that are similar to IRPA." *Hoffower*, 2024 WL 2882213, at *4 (collecting authority and examining relevant statutory language); *see also Kellman*, 2024 WL 2788418, at *6 (noting the court was "unpersuaded by [Defendant's] reliance on three recent cases [including *Verde*] that found no standing for similar allegations."). The Court should follow the weight of the authority on this issue and decline to adopt *Verde*'s minority position.

Defendant also dropped a one-sentence footnote in its factual background suggesting that Defendant's lack of a standalone database distinguishes this case from *Fischer v. Instant Checkmate, LLC*, where the court recognized that no third-party viewing is required. (Mem. at 5 n.7.) Defendant does not develop this thought, but it is wrong nonetheless. There is no practical difference between a website that pulls data from a database that it owns when someone searches for an identity and a website that pulls data from several databases when someone searches for an identity and displays those results. In both instances, an individual's identity is being held out to promote a defendant's subscription services, the injury the IRPA protects against. And, as Defendant makes clear in its section on opt-outs, it is the gatekeeper as to what information can be displayed in connection with any search results. Just as anyone who is in *Fischer*'s database could be searched, anyone not on Defendant's opt-out list can be searched, with solicitations to subscribe and access the searched-for reports generated in each instance. By holding out Plaintiff's identity to anyone who cared to search—as reflected in the screenshots from the Complaint and through Defendant's own search records—she has demonstrated her identity was held out for a commercial purpose. (*See* Complaint ¶ 5; Dkt. 136 ¶¶ 5, 22.) This is an injury in fact sufficient for Article III standing. *Hoffower*, 2024 WL 2882213, at *3.

Even if there were a viewing requirement, that is satisfied here. Defendant held out Plaintiff's identity along with a subscription offer to sell a product to anyone searching its website. (Complaint ¶ 5; Dkt. 136 ¶¶ ¶¶ 5, 22.) The point of this workflow is to display a teaser profile and get the searcher to subscribe to Defendant's product. Thus, that someone like Plaintiff's attorneys—the type of audience that buys background reports in connection with case investigations—searched for and were presented with a subscription advertisement only underscores that Defendant's workflow went exactly as intended (from Defendant's perspective).

From Plaintiff's perspective, this unconsented-to use of Plaintiff's identity to advertise a product took away her control over her identity, exactly what the IRPA was meant to protect against. 765 ILCS 1075/10. That Plaintiff's counsel viewed this violation does not somehow preclude the injury-in-fact requirement from being met. *See Hoffower*, 2024 WL 2882213, at *3–*4; *see also Nolen*, 2023 WL 4303645, at *8 ("Defendant commercially used Plaintiff's image the moment the public was able to access it in connection with its accompanying advertisements.").

Plaintiff's attorneys were not the only individuals who searched for Plaintiff's name and were presented with her identity, and offer for a report, in connection with that search. (*See* Dkt. 136 ¶¶ 5, 22; Dkt. 136-6 at 61) (reflecting teaser profile call on March 6, 2021).) Specifically, as reflected in data that Defendant only provided at the end of May 2024, an individual named Daniel Parziale ran two searches on March 6, 2021. (Dkt. 136–6 ¶ 8.) This person is apparently an attorney who, according to Defendant's Chief Technical Officer, made this search when Defendant was interviewing potential firms to represent it in this litigation. (*Id.* ¶¶ 8–9.) Importantly, this search was conducted by an individual who never appeared in this case. (*Azuz v. Accucom* Docket Sheet, attached as Exhibit A.) In fact, the firm that he was a part of when the searches were conducted, Beckage (Dkt. 136–6 ¶ 8 ¶ 9), has never made an appearance in connection with this case nor been affiliated with this case in any way. (Ex. A.) Instead, an entirely different firm, Hinshaw & Culbertson LLP, represented Defendant, until they were terminated as counsel and replaced with attorneys from Clark Hill LLP. (*Id.*) That Defendant's current attorneys were formerly affiliated with Beckage doesn't change the fact that neither Beckage nor the attorney who searched for Plaintiff's profile has ever been connected to the case. Simply put, a Beckage attorney ran the search and viewed the resulting teaser profile, (dkt. 136-6 at 61; Mem. at 6), but Beckage did not get Defendant's business in connection with this

litigation. (Dkt. 136–6 ¶ 8; Jaworski Decl., dkt. 136-7, ¶ 4–6 (noting "this litigation was placed with the law firm of Hinshaw & Culbertson LLP"). Defendant's attempt to explain this away by claiming Hinshaw was only retained due to unspecified "insurance requirements," (Jaworski Decl., dkt. 136-7, ¶ 6)*, doesn't alter this. Not to mention, that Hinshaw was terminated and replaced by a wholly different firm undermines this explanation. An attorney unaffiliated with this litigation was not the only other third party to conduct a search of Plaintiff's name on Defendant's website. One of Defendant's employees, a vice president named Vigen Sargsyan, also searched for and viewed Plaintiff's information on Defendant's website, apparently using his personal email address. (*See* dkt. 136–6; Mem. at 6.) Again, Defendant's website is working exactly as it intended: serving up Plaintiff's identity to person after person that might buy it.

Tacked on to Defendant's injury-in-fact argument are two uncited sentences that suggest Defendant's use of Plaintiff's identity is insufficiently "commercial" for an injury in fact to exist for standing purposes, (Mem. at 11.) This conflates what is required for standing with what is required to prevail on the merits of one's claim. Plaintiff has complained of a concrete injury caused by virtue of Defendant's website. This entitles her to press her case in this Court. *Hoffower*, 2024 WL 2882213, at *3. Whether she is entitled to relief for that injury—i.e., whether she can prevail on the merits of that claim—is a question for another day. *Hoffower* gets at exactly this distinction. There, court held that the plaintiff had standing to pursue her IRPA claim even when the only search on the defendant's website was conducted by her attorneys. *Hoffower*, 2024 WL 2882213, at *4. However, the Court went on to rule on the merits of the claim—which it could only do if it had jurisdiction pursuant to Article III—and found that the claim failed. *Id.* at *6 (finding that the plaintiff was not entitled to relief if the only search was conducted by her attorneys). The court held that because the plaintiff failed to show that anyone

besides her attorneys searched for her on the website, there was no genuine dispute as to whether Defendant held out her identity for a commercial purpose. *Id.* at *7. While that's not the case here (*see* Mem. at 6), the point remains that this is a question about the merits of the claim, not about the standing to bring it in the first instance. For purposes of the instant motion, it is enough that Plaintiff meets Article III's standing requirements. *See Hoffower*, 2024 WL 2882213, at *4.

**B.** **Defendant's programmatic use of Plaintiff's identity to advertise its products satisfies Article III's causation requirement.**

Defendant nominally makes a second argument aimed at Article III's causation requirement, claiming her injury is not traceable to Defendant's conduct. (Mem. at 11.) This is a distinct element of Article III, which is addressed here, though Defendant's argument is almost entirely a repeat of its injury-in-fact argument. The little new material that Defendant adds does not change the fact that Defendant created a business model that uses the identities of unsuspecting individuals, like Plaintiff and the putative class, to sell its subscription offerings. That's exactly what it did when it held out Plaintiff's identity to Plaintiff's counsel and others. Plaintiff's injury, the unconsented-to loss of control over how her identity is commercially used, is directly connected to this predatory business model. *See Nolen*, 2023 WL 4303645, at *7.

The causation element of Article III requires only that the injury be "fairly traceable to the challenged action of" a defendant. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 at 561 (1992)); *see TransUnion LLC v. Ramirez*, 594 U.S. 413 at 423 (2021) (noting a plaintiff must show "that the injury was likely caused by the defendant"). This is not a high hurdle. In fact, it is so apparent in right of publicity cases like this one that defendants rarely contest the causation requirement. *See Wilson v. Ancestry.com LLC*, 653 F. Supp. 3d 441, 454 (S.D. Ohio 2023) ("[Defendant] does not challenge the remaining two standing elements—causation and redressability, nor should it. Both

elements are satisfied here. [Plaintiff's] Complaint alleges that [defendant] used [plaintiff] and the proposed class members' personal information and their yearbook photos to promote paid subscriptions to [defendant]'s website without their consent, violating their publicity rights."). The connection between Plaintiff's injury and Defendant's conduct here is just as apparent.

Defendant deliberately built its workflow to hold out Plaintiff's identity along with advertisements of its subscription services. Complaint ¶ 5; SOF ¶¶ 5, 22. Defendant in fact held out Plaintiff's identity more than a dozen times to multiple individuals. Complaint ¶ 5; SOF ¶¶ 5, 22. Plaintiff did not consent to her identity's use in this way. Complaint ¶ 14. This workflow operated exactly as intended. And because of that, Plaintiff was deprived of the control over her identity's commercial use. *See* 765 ILCS 1075/10. That is all that is necessary for Article III's causation requirement to be satisfied. *See, e.g.*, *Wilson*, 653 F. Supp. 3d at 454; *Nolen*, 2023 WL 4303645, at *8. Notably, and for the same reasons discussed in the preceding section, this causal link exists regardless of whether any third party viewed the resulting advertisement. (*See* Section III.1.A, *infra*.) Defendant sweeps under the rug its decision to program its website to hold out Plaintiff's identity in connection with a subscription offer to any person searching for Plaintiff's name. Instead, Defendant focuses solely on the search results themselves and who viewed them, particularly those searches conducted by Plaintiff's attorneys (but not any searches conducted by anyone else), calling this a self-inflicted injury that cannot satisfy Article III. (Mem. at 12.)

The authority it cites in support, though, is inapposite.[1] Its lead case, *Fry v. Ancestry.com Operations Inc*. actually held that—just as here—"alleging a violation of the statute [there, Indiana's right of publicity act,] … [was sufficient] to give rise to Article III standing." No. 3:22-

---

[1]    *In re Saladino*, 71 Ill. 2d 263, 276 (1978) and *In re Howard*, 69 Ill. 2d 343, 354 (1977), are Illinois state court that do not address standing, much less Article III's requirements, at all.

CV-140 JD, 2023 WL 2631387, at *4 (N.D. Ind. Mar. 24, 2023). But the court thereafter suggested in dicta that the plaintiff might not have standing if the only search for his identity was conducted by his attorneys. *Id.* Courts have since distinguished this dicta when finding standing exists for claims like these. *See, e.g.*, *Kellman*, 2024 WL 2788418, at *6 (finding standing argument in *Fry* unpersuasive, noting *Fry* asserted "without citations that misappropriation 'necessarily requires' viewership); *Nolan*, 2023 WL 4303645, at *7 ("This analysis, made in *dicta*, cites no precedent regarding the [Indiana right of publicity statute] or similar statutes and appears to rely upon incorrect suppositions."). The *Nolan* court went on to note that the complained-of injury in *Fry* was the psychological stress caused by worrying about the defendant's use of his identity. *Nolen*, 2023 WL 4303645, at *7 (citing *Fry*, 2023 WL 2631387, at *5). The injury in *Nolan*, by contrast, like the injury here, went beyond this hypothetical future injury and stemmed from Defendant's decision to program its website to hold out Plaintiff's and the putative class's identities along with subscription offers to anyone who searched for them, including individuals like attorneys who would be likely to purchase those subscriptions. *Nolen*, 2023 WL 4303645, at *7 ("[S]omething did in fact allegedly happen (other than the decision to sue): Plaintiff's image was published by Defendant without her consent as part of an advertising flow.") (emphasis in original). Thus, "Plaintiff's claims [did] not result solely from an attorney manufactured event." *Id*. The Court should find the same here.

### C.   Defendant's remedial steps to "opt-out" Azuz from search results do not deprive her of standing to pursue injunctive relief.

Defendant claims that it has changed its website's workflow and opted Plaintiff out of being displayed in search results, thus mooting her injunctive claims. Defendant also asserts that Plaintiff cannot pursue injunctive relief because she moved out of Illinois. These arguments fail.

As an initial matter, Defendant misunderstands the relationship between mootness and

standing. "Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC)*, Inc., 528 U.S. 167, 191–92 (2000). Because these two doctrines are different, the Supreme Court has recognized that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Id.* at 190. Defendant's mootness arguments, at issue here, are unavailing.

First, that Defendant has taken upon itself to opt-out Plaintiff from being displayed in search results or otherwise amended its workflow, does not deprive her of "standing" to pursue her injunctive claims. "Voluntary cessation of challenged conduct moots a case … only if it is *absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (emphasis in original). "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190; *see, e.g.*, *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 97 (2013) (finding injunctive claim moot when there was a covenant between the parties promising no invasion of the plaintiff's property rights). Defendant's self-serving and conclusory statements about the likelihood of recurrence do not carry its heavy burden.

Defendant is not the first in a right of publicity case to try to moot a plaintiff's claims. In *Fischer*, the defendant people-search website "suppressed" the plaintiffs' information so that it would "not be displayed in search result." 2022 WL 971479, at *5. The defendant argued that

14

this mooted the plaintiffs' injunctive claims. The court disagreed, finding that the defendant "ma[de] no effort" to meet its burden beyond pointing to the suppression of plaintiffs' search results. *Id.* It thus held that the plaintiffs "retain[ed] a sufficient interest in the controversy to seek injunctive relief for the putative class members." *Id.*

Defendant takes the same tack here as in *Fischer*, claiming that it has processed an opt-out for Plaintiff, and otherwise edited the design of its webpage such that Plaintiff's identity will not be displayed. (Mem. at 13–14.) The permanence of these changes is no more guaranteed here than in *Fischer*. There is no reason that Defendant could not remove Plaintiff from the opt-out list as easily as they could place her on it. Defendant has an appeals process for denied requests in connection with its opt-out page suggests it exercises significant latitude in how these are processed. *See* https://infotracer.com/optout/ ("Should a request you previously made be denied, you have the right to appeal this decision.") Furthermore, Defendant provides nothing concrete about the cost of these changes or the difficulty in reversing them. (*Id.*) If anything, the fact that Defendant's Chief Technical Officer reports Defendant "continually makes updates to its Website" undermines that any change is irreversible or difficult. (Dkt. 136-6 ¶ 18.) Even Defendant's conclusion that "there is no risk that Accucom will revert its Search Results page to its pre-October 2021 design" is not attested to by anyone. (Mem. at 14.) Nor do vague statements about maintaining compliance with "a variety of laws" suffice to carry Defendant's burden. (Mem. at 13.) The IRPA has always prohibited the unconsented-to use of an individual's identity for commercial purposes, yet it took this lawsuit to get Defendant to edit its website.

Defendant does not explain why a different conclusion from *Fischer* is warranted. Defendant does not cite a single case—much less a one with similar facts—in which voluntary cessation of an activity mooted a plaintiff's claim. In fact, *Deakins v. Monaghan*, which

15

Defendant cites, underscores courts' reluctance to dismiss a plaintiff's claim because of a defendant's voluntary reforms. 484 U.S. 193, 201 n.4 (1988). *Deakins* cautioned against the scenario of a defendant "attempt[ing] to avoid appellate review by voluntarily ceasing the challenged conduct without losing the ability to reinitiate the conduct once the mooted case is dismissed." *Id.* It reiterated that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Id.* (quoting *United States v. Concentrated Phosphate Export Assn, Inc.,* 393 U.S. 199, 203 (1968)). In light of the near-identical facts and argument as to mootness between this case and *Fischer*, the Court should follow the same logic and reject defendant's argument.

Defendant also asserts that Plaintiff "lacks standing" to pursue her injunctive claims because she has moved to Minnesota. (Mem. at 14.) Defendant claims this will require an extraterritorial application of the IRPA. (*Id.*) But Defendant does not cite any authority for the proposition that Plaintiff can no longer pursue her injunctive claims by virtue of her move. The injunctive relief she seeks still relates to the publication of her information as an Illinois resident. Neither *Fischer* nor *Patel v. Facebook, Inc*., 932 F.3d 1264, 1276 & n.7 (9th Cir. 2019), which dealt with a different statute and did not address injunctive relief at all, require dismissal here.

## 2. Defendant's derivative arguments seeking denial of a separate motion brought by proposed intervenors should be rejected.

Defendant's coup-de-grace is to ask for a ruling that will not only stop Plaintiff's claim from going forward, but also the thousands of other putative class members who Defendant has injured in the same way. This is all based on Defendant's newly produced evidence regarding the search history of Plaintiff's identity on Defendant's website, which it conveniently withheld until after Defendant stopped using individuals' full names in search results and after the statute of limitations had run for new individuals whose full names were used without relying on a tolling

doctrine. Thus, Defendant seeks to use this belated disclosure to escape any IRPA liability whatsoever, including the claims brought by proposed intervenors. (*See* dkt. 132.)

Ultimately, this is a separate issue that should be resolved independently. Defendant's cited authority underscores this fact. In *Hudgins v. Bd. Of Educ. of City of Chicago*, the court addressed tolling in a motion to dismiss follow-on claims brought by a second plaintiff after the original suit was dismissed in part for lack of standing. No. 23 C 218, 2023 WL 4303004, at *5 (N.D. Ill. June 30, 2023) (Kennelly, J.). Proposed intervenors will argue that because standing exists for Plaintiff—again, even if the only search for Plaintiff's identity on the website was conducted by her counsel, *Hoffower*, 2024 WL 2882213, at *3—then *Walters v. Edgar*, 163 F.3d 430 (7th Cir. 1998) is inapplicable to the present case. Instead, the proposed intervenors should be allowed to come into the case and file an amended complaint on behalf of the original putative class. These proposed intervenors do not risk facing unique individual defenses that could potentially doom Plaintiff's claims. *See, e.g.*, *Hoffower*, 2024 WL 2882213, at *7 (granting summary judgment for defendant based on absence of other searches besides counsel). As set out in Plaintiff's motion to amend and reiterated in proposed intervenors' motion, this "[s]ubstitution of unnamed class members for named plaintiffs who fall out of the case … is a common and normally an unexceptionable (['] routine[']) feature of class action litigation both in the federal courts and in the Illinois courts." *Phillips v. Ford Motor Co*., 435 F.3d 785, 787 (7th Cir. 2006); *see also In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 616 (7th Cir. 2020) (noting that "Plaintiffs here sought only to rearrange the seating chart within a single, ongoing action" and recognizing that a "new representative may be able to help resolve or avoid problems with another class representative"); *Stampley v. Altom Transp., Inc.*, 14 CV 3747, 2019 WL 10891858, at *2 (N.D. Ill. Feb. 4, 2019) (similar). This follow-on request to deny a separate motion should be rejected.

## IV.    Conclusion

For the forgoing reasons, Defendant's motion should be denied in its entirety.

Respectfully submitted,

Dated: August 5, 2024

*/s/ Phillip L. Fraietta*
Philip L. Fraietta

BURSOR & FISHER, P.A.
Philip L. Fraietta
Julian C. Diamond
jdiamond@bursor.com
pfraietta@bursor.com
jdiamond@bursor.com
1330 Avenue of the Americas, 32nd Floor
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Michael W. Ovca (Bar No. 6327399)
movca@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I, Michael Ovca, an attorney, hereby certify that on August 5, 2024, I caused the above and foregoing ***Plaintiff's Opposition to Defendant's Motion to Dismiss*** to be served by transmitting such document via the Court's CM/ECF electronic filing system to all counsel of record.

/s/ Michael W. Ovca